**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **GARY ESTVANKO,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No.** |
| **v.** | : | **5:09-CV- 137(CAR)** |
| | : | |
| **CITY OF PERRY, et. al.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## ORDER ON MOTION TO ALTER OR AMEND
## & MOTION FOR SUMMARY JUDGMENT

Currently before the Court are Plaintiff Gary Estvanko's Motion to Alter or Amend Judgment and the Motion for Summary Judgment filed by Defendants City of Perry, et. al. (herein "the City"). This case arises out of the City's refusal to allow Plaintiff to use his property as a group home for foster children. Plaintiff contends that enforcement of the City's zoning ordinance prohibiting his home from operating in the R-1 Residential District violates provisions of the Fair Housing Act ("FHA"), 42 U.S.C. §3601, et. seq., which require that all persons be provided equal access to housing – regardless of their "familial status."

In a prior Order [Doc. 28], this Court found that the City's zoning ordinance was drafted neutrally and did not violate the FHA on its face. The Court accordingly granted judgment in favor of the City on that claim. Plaintiff has now filed a Motion to Alter or Amend that judgment pursuant to Rule 59(e). The City responded to Plaintiff's Motion and filed a Motion for Summary Judgment on the remaining claims. Both motions have been fully briefed and considered, and for the reasons

discussed below, the Court finds that Defendants are entitled to judgment on all claims. Thus, Plaintiff's Motion to Alter of Amend Judgment [Doc. 29] is **DENIED**, and Defendants' Motion for Summary Judgment [Doc. 32] is **GRANTED**.

## FINDINGS OF FACT [1]

Plaintiff Gary Estvanko operates a children's home in Centerville, Georgia and is a partner in another home in Bremen, Georgia. (Estvanko Dep. pp. 10-11). In 2000, Plaintiff purchased property near the City of Perry in Houston County with the intent to operate yet another children's home. (Estvanko Dep. p. 19). The new facility would potentially house up to twenty-four children currently in the care of the Georgia Department of Family and Child Services. (Estvanko Dep. pp. 47). In exchange for operating this home, Plaintiff expected to be paid by the State of Georgia up to $185 per day for each child. (Estvanko Dep. p. 13). Per state regulations, Plaintiff would not live at the home, but would delegate care of the children to paid staff members. (Estvanko Dep. pp. 32, 37, 53, 93, 94, 97). The property was never intended to be Plaintiff's residence or home. (Estvanko Dep. p. 37).

When construction on the home began, it was located outside of the City within the jurisdiction of Houston County. (Estvanko Dep. p. 19). While in the county, the property was zoned for agricultural

---

[1] Plaintiff did not respond to the City's Statement of "Material Facts Not in Dispute" [Doc. 32] or include any statement of facts in his brief in response. The Court thus adopts the City's statements of fact as undisputed. See M.D.Ga. L.R. 56 ("All material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate."); see also Mann v. Taser Intern., Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (holding that district court properly deemed defendant's statement of material facts admitted when plaintiff failed to comply with the local rule); BMU, Inc. v. Cumulus Media, Inc., 366 Fed. Appx. 47, 49 (11th Cir. 2010) (affirming grant of summary judgment when respondent failed to file a response to movant's statement of undisputed facts).

use. (Estvanko Dep. p. 21). As the project progressed, Plaintiff began having trouble with the building inspectors for Houston County. (Estvanko Dep. pp. 21-23). Plaintiff then discovered that the soil located on the property would not be conducive to providing well water and decided to request annexation by the City so that City water could be accessed. (Estvanko Dep. p. 23). On his application for annexation, Plaintiff stated that the house being built on the property would be used as a residence. (Estvanko Dep. p. 24). On December 7, 2004, the City annexed the property and allowed Plaintiff to access the City water system. (Estvanko Dep. pp. 27-28). The property was zoned, like every other property adjacent to it, as R-1 Residential. (Beecham Aff ¶ 9). The R-1 Residential zoning district is the most restrictive district in the City and allows only single family residences. (Beecham Aff. ¶ 10). Other districts, such as commercial, institutional, and R-3 Multi-Family Residential, allow multi-family dwellings and/or businesses. (Beecham Aff. ¶ 13).

After the property was annexed into the City, Plaintiff was able to finish construction without any more problems thanks to more cooperative inspectors. (Estvanko Dep. pp. 26-27). In July of 2007, Plaintiff sent a letter to the Perry City Council informing them that he and his wife wished to "open our home up to foster children." (Estvanko Dep. pp. 30, 36, 40). In this letter, Plaintiff asked for approval from the council to operate a "foster home." (Estvanko Dep. p. 36). A "foster home" is a home where a family would house one or two foster children. (Estvanko Dep. p. 40). By Plaintiff's own admission, his home would actually be a "group home," not a "foster home." (Estvanko Dep. p. 40). After conferring with the City's legal counsel, the Director of Planning and Zoning, Mike Beecham, informed Plaintiff that the City had no rules concerning "foster homes" and that foster children are not treated any differently than children living with their biological parents. (Estvanko Dep. p. 39).

Shortly after the July 2007 exchange, Mike Beecham received a call from the Georgia Department of Family and Child Services informing him of the true nature of Plaintiff's enterprise. (Beecham Dep. p. 30). It was during this conversation that Mr. Beecham learned that the house located on the property would not be used as a single-family residence where the owner would reside and care for a foster child, but instead would be operated as a "group home" with a paid staff that would need to come and go around the clock. (Beecham Dep. p. 30).

Upon learning this information, Mr. Beecham informed Plaintiff that the proposed use of his property was not suitable for the R-1 Residential district. (Beecham Dep. p. 30-31). Mr. Beecham suggested to Plaintiff that his use was more suitable for the recently created Institutional District and that Plaintiff should apply for a re-zoning of his property. (Beecham Dep. p. 30-31). Plaintiff heeded this advice and applied for a rezoning of the property from R-1 Residential to Institutional. (Estvanko Dep. p. 46). Plaintiff's request was presented to the City's Planning Commission which makes recommendations to the City Council. The City Counsel, not the Planning Commission, has final say as to whether or not a property is rezoned. (Beecham Dep. p. 46). The Planning Commission considered Plaintiff's request and voted to not recommend rezoning to the City Council. (Estvanko Dep. p. 43). Upon learning of this decision, Plaintiff removed his application for rezoning, thereby preventing the City Council from making any final decision on the matter. (Estvanko Dep. 43).

On the same day, he filed an application for de-annexation from the City. (Estvanko Dep. pp. 43, 49). This request was also presented to the Planning Commission which again recommended denial of the request on the grounds that the City had already allowed Plaintiff to connect to the City's water main in fulfillment of its commitment to Plaintiff, and it saw no reason to de-annex the property.

(Beecham Aff. ¶ 20). The City Council agreed and denied Plaintiff's extraordinary request to be de-annexed. (Beecham Aff ¶ 21). The only time in recent memory that a parcel has been granted a de-annexation involved a situation in which the City promised to extend a sewer line to a property but was unable to do so. (Beecham Dep. pp. 41-44). In that instance, the City felt that it had not lived up to its promise made to the property owner and granted the de-annexation. (Beecham Dep. pp. 41-44). De-annexation is considered an extraordinary measure. (Beecham Aff. ¶ 22).

Following the City's denial of Plaintiff's request for de-annexation, he filed a complaint with the Department of Housing and Urban Development ("HUD"). (Estvanko Dep. p. 71). Plaintiff later withdrew his HUD complaint, preferring instead to pursue his remedies in this Court.

## DISCUSSION

Plaintiff's claims in this case fall solely within the provisions of the FHA, 42 U.S.C. § 3604 (a)-(c). He did not plead or assert any other challenges or claims. In relevant part, the FHA provides that it is unlawful

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, *familial status*, or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, *familial status*, or national origin.

> (c) To take, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, *familial status*, or national origin, or an intention to make any such preference, limitation, or discrimination.

Id. (emphasis added). These provisions have been routinely interpreted to prohibit the enforcement

of zoning ordinances, like the one at bar, in a manner that denies a protected class equal access to housing. See City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 732,115 S.Ct. 1776, 1782 (1995); Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276, 1283 (11th Cir. 2006); Fair Housing in Huntington Comm. Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 366 (2nd Cir. 2003) ("Conduct prohibited by [§ 3604(a)] includes discriminatory zoning practices.").

Plaintiff has articulated multiple theories for recovery under the FHA. Plaintiff has asserted that the City's zoning ordinance is unlawful on its face; that the ordinance has a discriminatory impact on foster children living in group homes; that the City intentionally discriminated against the children in this case on the basis of their "familial status" when zoning decisions were made; and that the City violated the FHA by failing to provide "reasonable accommodations" for his group home. In an Order on November 17, 2010 [Doc. 28], this Court found that Plaintiff cannot state a claim under §3604(f)(3)(B) for the City's alleged refusal to provide "reasonable accommodations" for the children's "familial status" and dismissed that claim. The Court also found that the ordinance's definition of family was facially neutral, and thus it's plain language did not violate the FHA. Judgment was accordingly granted in favor of the City with respect to Plaintiff's claim that the ordinance is discriminatory on its face.[2] The Court then advised the parties that the remaining claims would be considered for summary judgment.

The City responded to the Court's Order by filing a Motion for Summary Judgment. Through its Motion, the City asserts that Plaintiff cannot satisfy a prima facie case of either disparate impact or

---

[2] Prior to filing their briefs, both parties understood that the Court would consider and decide this legal issue as a matter of law.

intentional discrimination. Plaintiff responded to the City's Motion and also filed his own Motion to Alter and Amend Judgment, charging that the Court committed clear error in finding that the City's zoning ordinance was facially neutral. Plaintiff has not objected to the Court's dismissal of his reasonable accommodation claim.[3]

Notably, one issue that both parties fail to specifically address is whether the proposed residents of Plaintiff's group home are even eligible for "familial status" protection under the FHA. While the parties have discussed at length the relevant distinctions between a traditional family home and Plaintiff's employee-staffed group home, neither questioned whether an employee-operated group home actually falls within the protected class. The Court, however, recognized this issue in its previous Order and declined to raise it *sua sponte* at that time. The Court now feels that it must address the issue. Clearly, if the residents of Plaintiff's group home are not protected by the FHA, the exclusion of their home from the R-1 Residential District cannot be said to violate the statute.

Plaintiff bases his claims entirely on the premise that "foster children" are a protected class under the FHA by virtue of the "familial status" provision. However, "familial status" is defined by the FHA as (1) one or more minors (2) domiciled with (3) a parent or other person having legal custody of the minor or the designee of a parent or person having legal custody of the minor. 42 U.S.C. § 3602(k). Thus, Plaintiff mis-defines the class of persons protected by the FHA when he states that the FHA protects "foster children." Foster children, in and of themselves, are not a class of persons protected by the FHA. Rather, the statute is intended to protect individuals living with children (related

---

[3] In the prior order, the Court acknowledged that Plaintiff did not have notice the Court was considering this legal issue and granted Plaintiff leave to file a timely motion for reconsideration which would be considered *de novo*. Plaintiff has chosen not to file a motion for reconsideration.

and unrelated) from being denied housing simply because children will be in the home. See Robert G. Schwemm, *Housing Discrimination Law and Litigation* § 11E:2 (2010) (explaining this provision to mean that "housing providers may no longer refuse to deal with people because their households include children.").

Any persons seeking protection under this provision, therefore, must qualify as a "family with children" by meeting the definition of "familial status" under the FHA. Because Plaintiff's proposed group home would be housing children under the age of eighteen, it meets the "one or more minors" element of the "familial status" definition. However, to satisfy the remainder of the statutory definition, the minors residing in Plaintiff's group home must be *domiciled with a* parent or other *person* having legal custody of the children or a designee thereof. See § 3602(k).

Plaintiff does not suggest that any of the children living in his group home would be living with a parent or a designee of a parent. Thus, by default, he must be proceeding under the theory that the children will be domiciled with another *person* having legal custody of the child or the designee of such *person* as contemplated by the FHA. As foster children, however, the children living in Plaintiff's group home would be wards of the State and in the legal custody of a government agency, the Georgia Department of Family and Children Services. Government agencies and political subdivisions are not specifically included within the definition of "person" under the FHA. See § 3602(d). The FHA defines a "person" as "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." Id.

Unfortunately, the question of whether state agencies fall within the FHA's definition of

"person" has not been squarely addressed in this context. However, the matter has been considered in other contexts. The United States Court of Appeals for the Tenth Circuit addressed the issue of whether a state agency has standing to bring a suit as an "aggrieved person" under the FHA and found that government agencies and political subdivisions could bring suit under the FHA even though they were not specifically included within the statute's definition of a person. <u>Housing Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City</u>, 952 F.2d 1183, 1194 (10th Cir 1991), *certiorari denied* 112 S.Ct. 1945, 504 U.S. 912, 118 L.Ed.2d 550. In another case, the Seventh Circuit held that foster parents licensed in Illinois are protected by the FHA from discrimination on the basis of familial status. <u>Gorski v. Troy</u>, 929 F.2d 1183, 1188 (7th Cir. 1991). The court did not address whether the Illinois Department of Child and Family Services was a "person having legal custody" of a minor, but found that foster parents may be considered "designees" within the meaning of the statute. <u>Id.</u> The court accordingly held that families with foster children could not be denied equal access to housing - implicitly recognizing the government agency as a "person" having legal custody of the minor. <u>Id.</u>

Neither of these cases are directly on point. Nonetheless, it is apparent that Congress intended the FHA to protect all "families with children" from housing discrimination. <u>See</u> 54 Fed. Reg. 3236 (Jan. 23, 1989). Congress did not distinguish between children related by blood, marriage, or adoption and unrelated children, and this Court finds no reason why Congress would have intended to exclude families with foster children from the "familial status" protection provided by the FHA. Therefore, the Court finds that the State of Georgia's Department of Family and Children Services ("DFACS") may be considered a "person" (i.e., an "unincorporated organization") having legal custody of such children under the FHA. <u>See</u> 42 U.S.C. § 3602(d) (including "unincorporated organizations" within the

definition of "person"). Foster parents or equivalently approved guardians or legal custodians may further be considered "designee[s]" of DFACS - entitling individuals living with foster children in Georgia to familial status protection under the FHA.

Even so, these findings do not fully resolve the issue before the Court. As discussed above, by definition "familial status" applies only if the parent, legal custodian, or designee of the parent or legal custodian is "*domiciled with*" the children. See 42 U.S.C.A. § 3602(k). Addressing this requirement, the Tenth Circuit Court of Appeals explained that, under the FHA, the term "domicile" was intended to refer to an individual's "true, fixed, and permanent home . . . ." See Keys Youth Svc., Inc. v. City of Olathe, KS, 248 F.3d 1267, 1271-72 (10th Cir. 2001). Thus, by the plain terms of the FHA, "familial status" requires that the minor's caretakers share the same fixed home as the minor. Id. at 1271 ("'Familial status' requires that the minors be domiciled 'with' their caretaker.").

In the present case, it is undisputed that Plaintiff purchased the property at issue with the intent to operate a children's home that would house up to twenty-four children with the approval of DFACS. This home was never intended to be Plaintiff's residence; it was always intended to be a commercial operation. In fact, state regulations prohibit Plaintiff from living in the home and require that he delegate care of the children to paid staff members. Plaintiff's property would thus operate as a commercial group home for children with a staff that would need to come and go around the clock. In exchange, the State of Georgia would pay Plaintiff up to $185 per day for each child.

Plaintiff's intended group home, therefore, would be an employee-staffed business, not a residence in which the children will be truly domiciled with their caretaker. Even if Plaintiff was to show that some caretakers would stay overnight or "reside" in the home, the residents would still fall

short of qualifying for familial status protection. See Keys, 248 F.3d at 1272. Clearly, while a person's "home" may be defined in many ways, his place of employment is not one of them. Id. at 1271 n.3. "Traditionally, an individual has only one domicile at a time," and thus, a person is not domiciled in a residence if he maintains an additional residence which he considers to be his true home. Id.

Moreover, to qualify for familial status protection, it would seem that the primary caretaker must not only live in the home with the children, but the adults and children should also function as family together. This rationale would not exclude foster children. As found above, foster families are protected by the familial status provisions of the FHA. See also Gorski, 929 F.2d at 1189. An institutional business operated by a rotating staff, however, is not a "family" in any sense of the word. To encompass such living arrangements within the FHA's protection of familial status would likely extend the scope of the statute beyond sensible bounds.

There is no evidence that Congress intended the FHA to provide protection for children living in staffed group homes – regardless of whether the staff resides on the premises. On the contrary, the principle statutory construction for this provision is that "*families with children* must be provided the same protections as other classes of persons" protected by the FHA. See 54 Fed. Reg. 3236 (Jan. 23, 1989) (emphasis added); Soules v. Dep't of Hous. & Urban Dev., 967 F.2d 817, 821 (2nd Cir.1992) ("Congress' primary concern [in passing the FHA] was to eliminate direct discrimination against families with children."). When enacting the familial status provision, Congress was not concerned about the zoning of group homes for children. Rather, Congress amended the FHA to include familial status protection because of the growing concern that "[i]n many parts of the country families with children [were being] refused housing despite their ability to pay for it." Eastampton Cntr, L.L.C. v.

Twp. of Eastampton, 155 F. Supp.2d 102, 116 (D.N.J. 2001) (citing H.R. Rep. No. 100-711, at 19 (1988) reprinted in U.S.C.C.A.N. 2173, 2180). Congress intended the provision to prevent discriminatory practices which resulted in "families with children" being forced to live in substandard or overcrowded conditions. See id. at n.16 (citing H.R. Rep. No. 100-711, at 19). Congress further noted that such discrimination often resulted in families living in separate homes altogether – forcing children to live apart from family members unnecessarily. See id.

While the FHA is intended to have a broad application, familial status protection is best applied when an individual is denied housing merely because a child will be living in the home. See e.g., Woodard v. Fanboy, L.L.C., 298 F.3d 1261 (11th Cir. 2002) (brought by woman alleging that she was evicted because she had children living with her); White v. U.S. Dept. of Housing and Development, 475 F.3d 898 (7th Cir. 2007) (brought by woman alleging that she was denied housing because she was an unwed mother); Hamad v. Woodcrest Condominium Ass'n, 328 F.3d 224 (6th Cir. 2003) (brought by resident wishing to live with teenage nephew in her second floor unit when condominium association restricted children to living on the first floor). Youth group homes have not historically succeeded in receiving familial status protection. See e.g., Keys, 248 F.3d at 1271-72 (holding that group youth home did not qualify for familial status protection under the FHA); Westhab, Inc. v. City of New Rochelle, N.Y., 2004 WL 1171400 * 15 (S.D.N.Y. 2004) (same); but see, Children's Alliance, 950 F.Supp. at 1497 n. 4 (declining to reconsider, without explanation, prior (unpublished) finding that residents of group home fell within FHA's definition of familial status).

After considering the language of the statute, the relevant case law, and the congressional history, the Court agrees with those refusing to extend the familial status protection for commercial

group homes.  The Court thus finds that Plaintiff's group home is in fact *not* entitled to familial status protection under the FHA.  The home will be staffed by rotating employees and does not fall within the class of persons Congress intended to protect when amending the FHA include to "familial status" protection.  Therefore, judgment is due to be granted in favor of Defendants on all claims.

However, even if the potential residents of Plaintiff's group home are entitled to protection under the FHA based upon their familial status, the end result would be the same.  The City's ordinance is facially neutral, and Plaintiff has failed to identify evidence to support a prima facie case of either disparate effect or intentional discrimination under the FHA.  Thus, as discussed in detail below, the Court did not err in its prior order, and Defendants are entitled to judgment on the remaining claims.

## I.      The City's Ordinance is Facially Neutral

The Court's prior finding that the City's ordinance did not violate the FHA on its face was not erroneous as alleged in Plaintiff's Motion to Alter or Amend Judgment.  Under Rule 59(e) a party may move to alter or amend a judgment in a civil case within twenty-eight days of the entry of judgment.  Fed.R.Civ.P. 59(e).  Although the rule does not set forth any specific criteria to be considered, courts have identified three grounds justifying relief under Rule 59(e): "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice."  Williams v. Cruise Ships Catering and Serv. Int'l, 320 F.Supp.2d 1347, 1357-58 (S.D. Fla. 2004); United States v. Battle, 272 F.Supp.2d 1354, 1357 (N.D. Ga. 2003).  In this case, Plaintiff does not identify a change in the controlling law or cite to new evidence.  Instead, Plaintiff argues that the Court's reasoning in the prior order was clearly erroneous.

In its November 17, 2010 Order, the Court found the City's zoning ordinance was facially

13

neutral because "foster children living in group homes" are not treated differently, on the face of the ordinance, than any other unrelated persons. The Court then cited a case out of the Southern District of Florida for the purpose of showing that the Court's finding was in accord with a conclusion reached in another case. See Jeffrey O. v. City of Boca Raton, 511 F.Supp.2d 1339, 1356 (S.D. Fla. 2007) (implicitly finding that ordinance was facially neutral because the definition treated all individuals alike, handicapped and non-handicapped, provided they were unrelated).[4]

The Court's findings were not clearly erroneous. The City's zoning ordinance defines a "family" as

> [o]ne (1) or more persons occupying a single dwelling unit, provided that, unless all members are related by blood, marriage or adoption, no such families shall contain over three (3) persons, in addition, a related family may have up to two (2) unrelated individuals living with them[.] The term family does not include any organization or institutional group.

Thus, on its face, the City's ordinance does not distinguish between different types of unrelated persons. In other words, the ordinance does not "single out" households containing unrelated children and treat them differently than households containing unrelated adults.

The Court also applied the law without clear error. When addressing a facial challenge to a zoning ordinance, the Court must focus only on the explicit terms of the ordinance; the effect or intent of the ordinance is irrelevant. Marriott Senior Living Svcs., Inc. v. Springfield Tp., 78 F. Supp.2d 376, 388 (E.D. Pa. 1999). In other words, an ordinance facially discriminates against a protected group only if the language on the face of the statute singles out protected persons and applies different rules to

---

[4] In the prior order, the Court referenced page sixty-five of that case, when in fact the correct page was fifty-six. See Jeffrey O., 511 F.Supp.2d at 1355-56.

them.  Jeffrey O., 511 F.Supp.2d at 1349.

Upon review, the Court again finds that the City's zoning ordinance is facially neutral.  There is no plain reference to households including unrelated children in the ordinance, and foster children living in group homes are not treated differently under the ordinance than any other unrelated individuals living together.  Handicapped adults, recovering alcoholics, battered women, sorority and fraternity members, and senior citizens living in groups of four or more are treated the same.  Of course, unlike these groups, children living with a parent, legal custodian, or a designee thereof are entitled to "familial status" protection under the FHA.  See 42 U.S.C. §3602(k).  Still, there is no basis to find that the ordinance singles out individuals living with children and treats them differently than any other class of persons.  The FHA certainly does not require that individuals living with children (related or unrelated) receive special treatment.  The statute only requires that "families with children" be provided the same protections as other classes of persons.  See 54 Fed. Reg. 3236 (Jan. 23, 1989).  On the face of the ordinance at issue here, it is apparent that households including children who are not related to their caretakers by blood, marriage, or adoption are provided the same protection as other types of households containing persons not related by blood, marriage, or adoption.  The ordinance does not discriminate against households with children on its face.

However, Plaintiff's argument is not lost on this Court.  The Court agrees that the *effect* of this ordinance may be that twenty-four minor children related by blood, marriage, or adoption will live in a single-family dwelling in an R-1 residential district with their parent or legal guardian, while three foster children cannot live in a single dwelling in an R1 residential district - even if they are living with a foster parent in a traditional family setting.  Thus, households which include unrelated children are

15

not treated similarly as those in which the children are related to their caretakers by blood, marriage, or adoption. This seems contrary to the spirit of the FHA. Again, familial status protection is afforded to *all* minors domiciled with a parent, legal custodian, or the designee thereof. See 42 U.S.C. § 3602(k). Other district courts have accordingly found that housing requirements mandating that a person have "legal custody" of children in the household violate the FHA. See e.g., Ortega v. Housing Auth. of City of Brownsville, 572 F. Supp.2d 829, 840 (2008).

The ordinance at issue here has no such requirement on its face, and for the purpose of the present inquiry, the *effect* of the ordinance is irrelevant. Marriott Senior Living, 78 F. Supp.2d at 388. Indeed, it appears that the argument Plaintiff makes is more aptly articulated as a disparate impact argument – i.e., that persons entitled to familial status protection are not being provided equal access to housing under the facially neutral zoning ordinance. With respect to the present claim, however, the Court again finds that the City's ordinance is neutral and does not, by its plain terms, violate the FHA.

## II. Disparate Impact Claim

As noted above, the core of Plaintiff's claims is essentially his allegation that the City's zoning ordinance has an unlawful discriminatory effect (or disparate impact) on foster children living in group homes. The FHA does provide relief from the application of a facially neutral ordinance that has a discriminatory impact on a group protected by the FHA. Regional Econ. Cmty. Action Program, Inc. (RECAP) v. City of Middletown, 294 F.3d 35, 52 (2nd Cir. 2002). When proceeding under this theory, no evidence of discriminatory intent is required; the plaintiff must only provide evidence of the discriminatory effect. Reese v. Miami-Dade County, 242 F. Supp.2d 1292, 1301 (S.D. Fla. 2002) (citing Elliott v. City of Athens, 960 F.2d 975, 984 (11th Cir. 1992)). A majority of courts use a burden

shifting analysis, similar to the one used in employment discrimination cases, to determine whether enforcement of a facially neutral ordinance violates the FHA.[5]  See e.g., Gallagher v. Magner, 619 F.3d 823, 833 (8th Cir. 2010). This Court will likewise use a burden-shifting analysis.

To state a prima facie case under a discriminatory impact theory, a plaintiff must show that enforcement of the ordinance has a disproportionate or disparate effect on a protected group.  Jeffrey O., 511 F.Supp.2d at 1365; RECAP, 294 F.3d at 52-53.  This is proven by demonstrating either that the ordinance or decision has "a segregative effect" on the protected group or that "it makes housing options significantly more restrictive for members of a protected group than for persons outside that group."  Hallmark Dev., 466 F.3d at 1286.  "Typically, a disparate impact is demonstrated by statistics," id., and the plaintiff is "not required to show that the policy or practice was formulated with discriminatory intent."  Huntington Branch, 844 F.2d at 934-35.

Once the plaintiff demonstrates a disparate impact, the burden shifts to the defendant to "prove that its [practice of enforcing the challenged zoning ordinance] furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'"  Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 383 (6th Cir. 2007)  (citing Huntington Branch, 844 F.2d at 936); see

_____

[5] Although the United States Court of Appeals for the Eleventh Circuit has not expressly addressed the issue of whether a burden shifting analysis should be employed in deciding disparate impact claims under the FHA, a majority of the federal circuits have adopted some form of either a two or three prong burden-shifting analysis.  See Gallagher v. Magner, 619 F.3d 823, 833 (8th Cir. 2010);  Ojo v. Farmers Group, Inc., 600 F.3d 1201, 1203, (9th Cir. 2010); Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth., 417 F.3d 898, 901-02 (8th Cir. 2005); Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains, 284 F.3d 442, 466-67 (3rd Cir. 2002); Langlois v. Abington Hous. Auth., 207 F.3d 43, 51 (1st Cir. 2000); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934-35 (2nd Cir. 1988).  District courts within the Eleventh Circuit have also applied a burden shifting analysis in disparate impact cases.  See e.g., Jeffrey O., 511 F.Supp.2d at 1356; Reese v. Miami-Dade County, 2009 WL 3762994 * 11 (S.D. Fla. 2009).

also, Lapid-Laurel, 284 F.3d at 466-67. Stated another way, the City must "demonstrate that its policy or practice ha[s] a 'manifest relationship' to a legitimate, non discriminatory policy objective and was necessary to the attainment of that objective." Gallagher, 619 F.3d at 834 (quoting Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth., 417 F.3d 898, 902 (8th Cir. 2005)); Reese v. Miami-Dade County, 2009 WL 3762994 * 11 (S.D. Fla. 2009). If the City shows that its actions were justified, the plaintiff may then attempt "to show 'a viable alternative means' was available to achieve the legitimate policy objective without discriminatory effects." See id; Gallagher, 619 F.3d at 834.

In this case, Plaintiff makes numerous allegations that foster children are disparately impacted by the zoning ordinance. To support his accusations, Plaintiff identifies hypothetical scenarios demonstrating how foster children may be deprived equal treatment under the statute and asserts that foster children as a class are thus harmed by the zoning ordinance's restrictions. This Court agrees that, hypothetically, such situations may possibly have a disparate impact on foster children.

The difficulty with Plaintiff's argument on summary judgment, however, is that it is inherently speculative. To survive summary judgment, a plaintiff must make a prima facie case of discrimination by showing an adverse effect on the protected class "by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." Graoch Assocs, 508 F.3d at 373. Thus, the kind of statistical analysis needed to prove a disparate impact claim must be more than speculative. Hallmark Dev., 466 F.3d at 1286-1287. The evidence should also ideally show that an actual group of protected persons are currently being denied an equal right to housing. As noted by the Eleventh Circuit Court of Appeals, successful disparate impact claims are usually supported by evidence that "there is a waiting list for . . . housing or a shortage of housing for

which only a defined group qualified." Id. at 1287.

In this case, Plaintiff has failed to provide any evidence that foster children are actually denied equal access to housing because of the City's ordinance. Plaintiff has offered absolutely no statistical evidence of a discriminatory impact on foster children. Nor is Plaintiff's argument supported by other evidence showing that the ordinance has "a segregative effect" on a certain percentage of children in the population or that "it makes housing options significantly more restrictive" for foster children. Plaintiff has likewise failed to provide any evidence that children are actually waiting to move into his home or that foster children will otherwise be denied housing in the R-1 Residential District because of the ordinance. By the same token, there is no evidence showing that the ordinance causes an adverse effect on foster children. Plaintiff merely relies on the general proposition that it is better for children to live in a single-family residential neighborhood. He cites no expert testimony or other evidence to support his broad generalization. Plaintiff has thus failed to produce sufficient evidence to establish a prima facie case of discriminatory impact under the Fair Housing Act, and summary judgment should be granted favor of the City as to this claim. See Macone v. Town of Wakefield, 277 F.3d 1, 8 (1st Cir. 2002) (affirming grant of summary judgment where plaintiff failed to provide evidence that any minorities would actually move into the housing).

Even if Plaintiff could make a prima facie case of disparate impact, the City has identified evidence that the zoning ordinance furthered, in theory and in practice, a legitimate, bona fide governmental interest. It is undisputed that the zoning district in question, the R-1 Residential Zoning District, is the City's most restrictive district. It allows only single-family residential homes and other uses necessary to a residential neighborhood such as schools and churches. According to the City, it

19

has restricted property use in this zone in an effort to maintain the residential character of this setting, and the single-family residential character of the neighborhood would be utterly defeated by allowing a business enterprise to operate within it even if that business is to operate a facility for foster children. This Court agrees that if multifamily or business enterprises of any type are established within the single-family residential district, its character is fundamentally changed. The City's interest in preserving the single family residential character of the district is a legitimate justification for its zoning restriction. See DeSisto Coll., Inc. v. Town of Howey-in-the-Hills, 706 F. Supp. 1479, 1506 (M.D. Fla. 1989) (finding that city had legitimate interest in preserving residential nature of town), aff'd, 888 F.2d 766 (11th Cir. 1989); see also Village of Belle Terre v. Boraas, 416 U.S. 1, 7-9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 394–95, 47 S.Ct. 114, 71 L.Ed. 303, (1926) (explaining that preserving the residential character of the district is a rational basis for a zoning law); Larsen v. Town of Corte Madera, 104 F.3d 365, 365 (9th Cir. 1996) (affirming finding based on town's interest in maintaining the residential character of neighborhoods); Felix v. Young, 536 F.2d 1126, 1136 (6th Cir. 1976) (finding ordinance to be rationally related to the legitimate municipal interest of preserving the residential character of urban neighborhoods); Jeffrey O., 511 F.Supp.2d at 1351 (recognizing interest in protecting the residential character of a neighborhood).

The City does not exclude group homes from all residential districts. Group homes are permitted in other residential areas, and the City has now made certain that group foster homes are expressly included in the definition of "personal care home," clarifying that residential districts are in fact open to them. The City has thus shown that its zoning ordinance furthers a legitimate government interest in the least discriminatory means possible. Plaintiff has not identified any evidence to the contrary.

Accordingly, summary judgment is due to be granted in favor of Defendants as to this claim.

## III.     Intentional Discrimination Claim

In addition to his claim of discriminatory effect, Plaintiff also claims that the City, through its zoning practices and decisions, intentionally discriminated against foster children living in group homes. The familiar burden-shifting analysis established for employment discrimination cases is also used to analyze claims of intentional discrimination under the FHA. Bonasera, 342 Fed. Appx. at 584; RECAP, 294 F.3d at 52; Graoch, 508 F.3d at 371; Secretary, U.S. Dep't Hous. & Urban Dev. ex rel. Herron v. Blackwell, 908 F.2d 864, 870-71 (11th Cir.1990).

To prove intentional discrimination, "a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA." Bonasera, 342 Fed. Appx. at 584; Reese, 2009 WL 3762994 at *10; Reese v. Miami-Dade County, 242 F.Supp.2d 1292, 1301 (S.D. Fla. 2002). Thus, to establish a prima facie case of intentional discrimination, the plaintiff "must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." RECAP, 294 F.3d at 49. A plaintiff may meet this burden by demonstrating that the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that [discriminatory] considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens." Hallmark Dev., 466 F.3d at 1284. The Eleventh Circuit has also recognized four factors that are instructive in determining whether discriminatory intent is present: "discriminatory or segregative effect, historical background, the sequence of events leading up to the challenged actions,

and whether there were any departures from normal or substantive criteria." Id.

If the plaintiff is successful in demonstrating a prima facie case of intentional discrimination, the defendant must come forward with evidence of a legitimate, non-discriminatory reason for its actions. Housing Investors, 68 F. Supp. 2d at 1300. If the defendant is able to make this showing, the plaintiff is then required to identify some evidence demonstrating that defendant's proffered non-discriminatory reasons are merely pretext and that the intended inhabitant's protected status was in fact a motivating factor in the adverse decisions. Id. The plaintiff's evidence of discriminatory intent need not show that the protected status of the intended inhabitants was the sole or dominant factor for the zoning decision; he need only show "that it was a motivating factor." Id. at 1299.

Here, Plaintiff has failed to identify evidence to support a prima face case of intentional discrimination under the FHA. As discussed above, Plaintiff offers no concrete evidence to support his claim of discriminatory impact or segregative effect. He also failed to cite any evidence of intentional discrimination in the historical background or the sequence of events leading up to the challenged actions, and he has not shown that there were any departures from normal or substantive criteria. See Hallmark Dev., 466 F.3d at 1284 (listing factors relevant to finding discriminatory intent).

On summary judgment, Plaintiff merely asserts that intentional discrimination is apparent in this case because foster children who live in a group home are not allowed in the R-1 Residential District. Plaintiff further suggests that the City is disingenuous when it claims that the home is properly excluded from the district because it is a for-profit business rather than a purely residential home. Plaintiff's arguments are mere assertions, however, and are not supported by any evidence which would allow a jury to find intentional discrimination in this case. Plaintiff likewise fails to support his allegation that

the City's segregation of single-family residential homes from commercially operated residential housing facilities is not a legitimate governmental interest. Plaintiff's intentional discrimination claim thus fails as a matter of law, and Defendants are entitled to summary judgment.

## CONCLUSION

For all of the above reasons, Plaintiff's Motion to Alter of Amend Judgment [Doc. 29] is **DENIED**, and Defendants' Motion for Summary Judgment [Doc. 32] is **GRANTED**. Judgment is to be entered in favor of Defendants on all claims.

**SO ORDERED** this 6th day of May, 2011

<u>S/ C. Ashley Royal</u>
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

jlr